# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CAROL HUBBARD,

       Plaintiff,

    vs.                                     Civ. No. 17-763 KK/JHR

J MESSAGE GROUP CORP.,
a Vermont corporation, KENNETH
CHARLES ALEXANDER and
DEBORAH SUE ALEXANDER,
Husband and Wife,

       Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION TO DISMISS[1]

**THIS MATTER** is before the Court on Defendants' Rule 12(b)(6) Motion to Dismiss

With Supporting Memorandum (Doc. 19) ("Motion"), filed November 16, 2017. Plaintiff filed a

Response on January 24, 2018 (Doc. 32).[2, 3] Defendants filed a Reply on January 16, 2018

(Doc. 28). The Court, having reviewed the parties' submissions and the relevant law, and being

otherwise fully advised in the premises, finds that the motion is well taken and shall be

**GRANTED**.

## BACKGROUND

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Docs. 16, 17, 18.)

[2] Plaintiff initially filed a Response on December 18, 2017, that was stricken from the record. (Doc. 22.) Plaintiff refiled her Response on January 24, 2018. (Doc. 32.)

[3] Plaintiff attached a Declaration and two exhibits to her Response. (Docs. 32-1, 32-2, 32-3.) These attachments were not referred to or incorporated by reference to Plaintiff's Amended Complaint and have not been considered in the Court's ruling on Defendants' Motion to Dismiss.

For the purpose of ruling on Defendants' Motion, the Court assumes that the following well-pled facts taken from Plaintiff's Amended Complaint are true.[4] *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016) ("[I]n reviewing a motion to dismiss, [the Court] accept[s] the facts alleged in the complaint as true and views them in the light most favorable to the plaintiff."). Defendant J Message Group Corp. ("JMGC"), also called Companions of Wisdom ("CoW") is a closed, invitation-only, nonprofit organization, incorporated under the laws of the State of Vermont, with its principal place of business in Vermont. (Doc. 15 at ¶ 10.) Defendant Kenneth Alexander and Defendant Deborah Alexander (husband and wife) are officers and directors of JMGC, and they are citizens of the State of Washington. (*Id.* at ¶¶ 10, 12.) Defendants conduct fee-based seminars and conferences and develop written materials to promote their reincarnation-based doctrines, worldview, and advocacy agenda to its members and to those interested in engaging in its programs. (*Id.* at ¶¶ 11, 20.) Plaintiff, a citizen of the State of Virginia, met and became acquainted with the Alexanders and with JMGC in 2008, and she began paying to attend JMGC's conferences. (*Id.* at ¶ 20.) The actions giving rise to this lawsuit occurred during a JMGC conference held in Santa Fe, New Mexico. (*Id.* at ¶¶ 6, 34-35.)

Defendants promote the belief that people have past lives that influence their current life and, as noted earlier, Defendants develop written materials to promote their reincarnation-based doctrines, worldview, and advocacy agenda to the organization's members. (*Id.* at ¶¶ 11, 14) As part of the CoW program, Defendants hold seminars and issue publications to the members of

---

[4] Although a court must generally take the allegations in a complaint as true, no matter how skeptical the court may be, "[t]he sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it[,]" for example, those related to "experiences in time travel." *Iqbal*, 556 U.S. at 696, Souter, J. dissenting; *Valdez v. Nat'l Sec. Agency*, 228 F.Supp.3d 1271, 1280 (D. Utah 2017) ("At the pre-discovery motion to dismiss stage, [the district court] must assume the truth of well-pleaded factual allegations that are not simply legal conclusions or bare assertions of the elements of a claim—so long as the allegations do not defy reality as we know it[.]")

JMGC. (*Id.* at ¶¶ 11, 30.)  JMGC is authoritarian in nature and does not permit dissent or questions regarding its doctrines or leadership. (*Id.* at ¶ 12.)

Mr. Alexander is the "spiritual leader" of JMGC. (*Id.* at ¶ 12.)  Mr. Alexander compels the members of JMGC to adopt the organization's reincarnation doctrines and hierarchical structure. (*Id.* at ¶¶ 12, 14.)  Mr. Alexander claims to channel communications from higher beings or master guides, which communications include instructions and beliefs that are binding on the members of JMGC. (*Id.* at ¶ 13.)

JMGC lures people who are looking for spiritual direction and altruistic involvement by initially promoting self-improvement and by engaging its members in discussions and providing publications relating to broader contemporary topics such as history, economics, and spiritual development. (*Id.* at ¶ 15.)  When prospective members wish to advance their association with JMGC and share details of their personal lives with Defendants, Defendants collectively engage in a process designed to control, isolate, shame, emotionally harm, and take advantage of the prospective members, which process is contrary to JMGC's "self-improvement banner." (*Id.* at ¶ 16.)  Members who dissent or question the leadership's directives become the targets of "shaming conduct"—meaning that Defendants "collectively disseminate false information coupled with outrageous accusations, in CoW communications, designed solely to cause dissenting members substantial emotional and psychological trauma." (*Id.* at ¶ 17.)  Dissenting members are subjected to this "shaming conduct" until they recant their dissent or quit the organization. (Id. at ¶ 19.)

As Plaintiff's involvement in JMGC increased, Plaintiff had questions about JMGC/CoW's operations and beliefs. (*Id.* at ¶ 21)  Defendants did not like Plaintiff's inquiring nature and resistance to questionable directions, and they collectively engaged in a campaign to

discredit her, and to cause problems in her personal life and to her professional reputation. (*Id.* at ¶¶ 22, 23.) On one occasion, Plaintiff—who is a government contractor with a high-level security clearance, having attended a CoW conference abroad asked Mrs. Alexander for the name and sponsor of the conference so that she could provide that information on a United States Government security clearance application as required by her employer. (*Id.* at ¶ 24.) Mrs. Alexander demanded that Plaintiff refrain from disclosing the fact that she had travelled overseas to attend the CoW conference, and insisted that Plaintiff lie to the federal government about the purpose of her travel under threat of "severe consequences" if she did not comply with this directive. (*Id.* ¶ 25.) Plaintiff refused to comply with Mrs. Alexander's directive to lie to the federal government on the ground that any act of dishonesty or misconduct could compromise her professional credentials and her job. (*Id.* ¶ 27) This notwithstanding, Mrs. Alexander continued to urge Plaintiff to lie, and Plaintiff continued to refuse to do so. (*Id.*) In retaliation for Plaintiff's refusal to lie on her security clearance application, Defendants published "Communication 17" (dated February 12-13, 2016) to its membership, stating that: "she [Plaintiff] has a split who is a porn star and is seen doing sex acts with her husband. That is all she does . . . the Hubbard Soul has been part of several sex cults, including the Manson cult." (*Id.* at ¶ 28 (italics omitted).)

In a further act of retaliation, Mr. Alexander began interfering with Plaintiff's personal relationship by urging her then fiancée (now husband) Ken Kyzer to break off his relationship with Plaintiff because she was a destructive influence. (Doc. 15 at ¶ 29.) Defendant Kenneth Alexander told Ken Kyzer that if he were going to be a committed partner associated with CoW, he would have to end his relationship with Plaintiff. (*Id.*) Because Mr. Kyzer refused to end his relationship with Plaintiff, Defendants terminated Plaintiff's membership in JMGC/CoW,

thereby prohibiting Plaintiff from reading Mr. Alexander's channeled communications, and also prohibiting her from attending Defendant's conferences or events. (Doc. 15 at ¶ 30.)

Thereafter, (from February 25, 2016 through February 28, 2016) Defendants held a JMGC/CoW conference in Santa Fe, New Mexico. (*Id.* at ¶ 31.) During this conference, Defendants presented the following statements about Plaintiff to the membership of JMGC:

a.   Recently, we had to discontinue the access for one aspect of that soul [Carol Hubbard]. And why is that? **Because . . . they were very predatory in this group.**

b.   **Sandra Otterson, another famous porn star, they do have a split in your group,** believe it or not, but they also have one that just left: **Carol Hubbard.**

c.   **The sexual predators** you might think are fairly easy to spot because they make you uncomfortable to be around, but they're still there. **And your friend Carol Hubbard was a sexual predator, but she was also a financial predator because she was poor.** And you have many who come in contact with this group thinking that this is where they will make their riches.

d.   We don't judge you over the fact that you have sexual desires or that you want to have wealth. **But if you're using other people to get it in a way that is inappropriate,** you need to stop and think about how far you're going to get before we see what you're doing. **That is why Carol Hubbard and Ken Kyzer are no longer in your group.**

e.   So this guy who is, uh, previously a reader (Rob Murphy), just reactivated, how long ago what that Deborah?

Deborah [Alexander]: Three days ago.

Three days ago. **So we got right of the other one, Carol Hubbard, and now we have this guy. Okay? So, they really want to be involved in this work, but I don't take them seriously any longer . . . But you've got to understand just how messed up human psychology is, to see how you can get such a diversity of expression in the human form.**

f.   Why are we always so hard on the pornographers? Is it because they're predatory? In most cases, who makes all the money? It's the pornographer, it's not the porn star.

Well, these two, Nina Hartley and Sandra Otterson are a little smarter because they took control of their own destiny and they are the ones making the money . . . But they're still predatory on people who cannot express their sexuality in a normal functional manner.

g.    What's happened recently with the Scribe's split, Ken Kyzer, is an example of how the 2nd ray not only got subverted, but got completely kicked out. And what was it due to? I am going to be very blunt about it. **It was about sex and money.**

In this group we have worked extremely hard to remove these as factors in the group's functioning. **We have tried to keep predatory people out of the group, either who are predatory sexually or monetarily. The sexual predators you might think are fairly easy to spot because they make you uncomfortable to be around, but they're still there.**

**And your friend Carol Hubbard was a sexual predator, but she was also a financial predator because she was poor.**

And you have many who come in contact with this group thinking that this is where they will make their riches . . .

h.    **Sexual predation is very common**. It's a very common part of the 3rd ray Psychoanthropology because 3rd rays tend to be very insensitive to others.

**They seek ways of gaining control over others and whether it's sex, money or power, they'll use one or more of these things to gain, uh, the upper hand.**

**We have told the higher self of Carol Hubbard that if they want to stay in the group, if they want to have a functioning member of the group, there can be no sexual or financial predation going on.**

The Scribe's higher self needs to come forward and explain what it is they did to cause the Carol Hubbard/Ken Kyzer problem from occurring in the first place because they were largely responsible for that.

**This group cannot exist with financial or sexual predators.** You cannot come into this group thinking, "Well, I need to get myself laid," or "I need to make a buck."

If you happen to meet somebody in the group and you're attracted to them and you form a relationship, that's perfectly fine.

But if your sole purpose of being here is to have sex, you're in the wrong place. The same is true if you're here to try to make money off of people in the group. This is not the place to do it . . .

**But what you have seen with Carol Hubbard and Ken Kyzer is a perfect example of what we are trying to prevent in this group.**

(*Id.* at ¶¶ 31, 35.) (Emphasis in original.)

The statements, which were made live at the Santa Fe conference before an audience of more than 100 attendees in retaliation against Plaintiff and Mr. Kyzer, were, thereafter, edited, transcribed, and published online on the JMGC/CoW website which is available to JMGC's worldwide membership. (*Id.* at ¶¶ 33, 34, 37.) Because Defendants had ousted Plaintiff from JMGC, she was precluded from reading the transcribed texts. (*Id.* at ¶ 35.) The statements have caused Plaintiff extreme embarrassment and emotional distress, and have caused third-parties, friends and associates to avoid being associated with her out of fear of being associated with the statements. (Doc. 15 at ¶¶ 40, 41.)

Defendants' treatment of Plaintiff is consistent with their history and pattern of targeting members, particularly females, who dissent or question their directives, with shaming conduct. (*Id.* at ¶¶ 17, 19, 42-44.) Defendants have previously maligned dissenting females by publishing statements labeling a well-respected former member of the United States Congress who was not a CoW member, but founded an organization that CoW's members are expected to volunteer for and financially support, "as a madam at a bordello and a slave holder; and stating that another such person was a black whore, who aided and[] otherwise[] contributed to Dr. Martin Luther King, Jr.'s assassination." (*Id.* at ¶ 44.)

Based on the foregoing allegations, Plaintiff seeks to recover damages on four theories of liability: (1) Defamation and Defamation Per Se, (2) False Light Invasion of Privacy, (3) Intentional Infliction of Emotional Distress, and (4) Civil Conspiracy. (Doc. 15 at 11-17.)

Plaintiff also seeks to enjoin Defendants from permitting continued access to its membership to the allegedly defamatory statements about her, to enjoin Defendants from publishing any further defamatory comments about her, and an order compelling Defendants to redact Plaintiff's and Mr. Kyzer's names from JMGC/CoW communications, transcripts, and publications.  (Doc. 15 at 17.)   Defendants move to dismiss these claims on the ground that the at-issue beliefs and communications are "religious" and, as such, Plaintiff's claims, which arise from a purely religious controversy, are barred by the "church autonomy doctrine"—an affirmative defense grounded in the First Amendment to the Constitution.   (Doc. 19 at 11-17.)  Defendants argue, in the alternative, that each of Plaintiff's claims should be dismissed on the merits for failure to state a claim upon which relief can be granted.  (*Id.* at 17-29.)  For the reasons discussed herein, the Court concludes that Plaintiff's claims are barred by the First Amendment.   Because Plaintiff's claims are dismissed on First Amendment grounds, the Court does not consider Defendants' alternative arguments.

## ANALYSIS

### I.        The Standards Governing a Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the plaintiff's complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In undertaking this analysis, the Court considers "the complaint as a whole, along with the documents incorporated by reference into the complaint," construes all well-pled allegations in the light most favorable to the plaintiff. *Nakkhumpun v. Taylor*, 782 F.3d 1142,

1146 (10th Cir. 2015). "Well-pled" means that the allegations are "plausible, non-conclusory, and non-speculative." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Courts "disregard conclusory statements and look only to whether the remaining . . . factual allegations plausibly suggest the defendant is liable." *Mocek v. City of Albuquerque*, 813 F.3d 912, 921 (10th Cir. 2015).

## II.  In the Context of This Case the Court Shall Treat the "Church Autonomy Doctrine" as an Affirmative Defense

It is a longstanding principle of law that secular courts have no jurisdiction over matters that are "strictly and purely ecclesiastical." *Watson v. Jones*, 80 U.S. 679, 733 (1871). This principle, which is rooted in the fundamental right of religious freedom, acknowledges that by voluntarily joining a religious association which is engaged in the expression and dissemination of any religious doctrine, a person impliedly consents to be governed, in ecclesiastical matters, by the religious organization's "organic laws, their books of discipline, . . . their collections of precedents, . . . [and] their usage and customs[.]" *Id.* at 729. Because the religious organization, itself, is the best judge of "what constitutes an offence against the word of God and the discipline of the church[,]" the organization retains exclusive control over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them[.]" *Id.* at 732-33. For a secular court to intervene in such matters by permitting individuals aggrieved by the religious organization's ecclesiastical administration to adjudicate such matters in civil court would be to subvert the inherent right of religious bodies to exercise religious freedom. *Id.* at 729.

The foregoing principles originally grounded in common law,[5] have long since been tied to the religion clauses of the First Amendment to the Constitution, which prohibit Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (recognizing that the freedom accorded to religious organizations from secular control or manipulation is grounded in the First Amendment); *see Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 191 (1960) (holding that the religion clauses of the First Amendment apply to the judiciary as well as to the legislature). In a body of law commonly known as the "church autonomy doctrine" or the "ecclesiastical abstention doctrine" the Supreme Court has adhered to the principle, originally established in *Watson*, that secular courts should abstain from adjudicating, and indeed have no jurisdiction over, matters that are fundamentally ecclesiastical or religious in nature. *See Serbian E. Orthodox Diocese for the U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 709-10 (1976) (recognizing, consistent with *Watson*, that the resolution of religious disputes is the purview of ecclesiastical, not civil, tribunals); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 185-86 (2012) (quoting *Kedroff* for the proposition that *Watson* "radiates a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." (alteration omitted)).

---

[5] *Watson*, a diversity case, was decided before the First Amendment had been rendered applicable to the States through the Fourteenth Amendment, and was, therefore, grounded in common law instead of the Constitution of the United States. However, cases decided after the Fourteenth Amendment to the United States Constitution have recognized that the principle established in *Watson* accords with the religion clauses of the First Amendment and "have a clear constitutional ring." *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 709-11 (1976). Thus, the Supreme Court has continued to rely on the reasoning of, and the holding in, *Watson* insofar as it pertains to the question of civil court's involvement in ecclesiastical issues. *Id.* at 710; *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 185-87 (2012) (discussing, and not contravening, *Watson* and its progeny).

After passage of the Civil Rights Act of 1964, courts recognized the existence of a "ministerial exception" which, like the far older church autonomy doctrine, is grounded in the First Amendment. *Hosanna-Tabor*, 565 U.S. at 188. The ministerial exception is a narrow subcategory of the church autonomy doctrine that "precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna–Tabor*, 565 U.S. at 188; *see id.* at 194-95 ("The [ministerial] exception ... ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." (Citation omitted.)); *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1242 n.4 ("Out of [the] broad prohibition [of the church autonomy doctrine], the courts have carved a narrower ministerial exception . . . that prevents adjudication of Title VII employment discrimination cases brought by ministers against churches.").

Over time, courts applying the church autonomy/ecclesiastical abstention doctrine (hereinafter "the church autonomy doctrine") and the ministerial exception have taken inconsistent stances in regard to their procedural operation—pertaining particularly to the issue whether either or both constitute an affirmative defense as distinct from a jurisdictional bar. The Supreme Court, observing in *Hosanna-Tabor* (an employment discrimination case), the existence of a "conflict" among the Courts of Appeals over whether *the ministerial exception* is a jurisdictional bar or a defense on the merits resolved the issue by concluding that the ministerial exception "is an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Hosanna-Tabor*, 565 U.S. at 195 n.4. This, the Supreme Court reasoned, "is because the issue presented by the exception is whether the allegations the plaintiff makes entitle him to relief, not whether the court has the power to hear the case." *Id.* While *Hosanna-Tabor* unquestionably

confirmed that the ministerial exception is an affirmative defense, courts continue to take opposing positions on the issue of whether the broader, and far older church autonomy doctrine operates as an affirmative defense or a jurisdictional bar.

On one hand, several courts continue to rely on *Watson* and *Milivojevich* (which were discussed approvingly in *Hosanna-Tabor*) for the proposition that the church autonomy doctrine precludes a court's subject matter jurisdiction over ecclesiastical matters. *See e.g.*, *Doe v. First Presbyterian Church of USA of Tulsa*, 2017 OK 106, ¶¶ 8-9, __ P.3d __ (Okla. 2017) (distinguishing the relatively new ministerial exception from the "far older" church autonomy doctrine; and concluding that *Hosanna-Tabor* only stands for the proposition that the ministerial exception is an affirmative defense, whereas the 1871 Supreme Court decision in *Watson*, in which the church autonomy doctrine was first recognized continues to stand for the proposition that it is a jurisdictional bar); *Church of God in Christ, Inc. v. L.M. Haley Ministries, Inc.*, 531 S.W.3d 146, 157-59 (Tenn. 2017) (noting that "the Supreme Court did not address the ecclesiastical abstention doctrine in *Hosanna-Tabor*" and concluding, based upon *Watson* and its progeny, that where it is applicable, the doctrine operates as a jurisdictional bar); *Bilbrey v. Myers*, 91 So.3d 887, 890-91 (Fla. Dist. Ct. App. 2012) (holding that the church autonomy doctrine operates to bar subject matter jurisdiction over tort claims against religious institutions). These Courts take the position that the church autonomy doctrine and the ministerial exception are distinct concepts and, under *Watson* and its progeny, the church autonomy doctrine constitutes a jurisdictional bar, whereas pursuant to *Hosanna-Tabor* the ministerial exception is an affirmative defense.

On the other hand, some courts—including of relevance here, the Tenth Circuit Court of Appeals and the New Mexico Court of Appeals, have long held that the church autonomy

doctrine is an affirmative defense. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 (10th Cir. 2002) (holding, prior to the *Hosanna-Tabor* decision, that the church autonomy "defense" is "more appropriately considered as a challenge to the sufficiency of plaintiff's claims under Rule 12(b)(6)" than a challenge to the court's subject matter jurisdiction pursuant to Rule 12(b)(1); *Celnik v. Congregation B'Nai Israel*, 131 P.3d 102, 105 (N.M. Ct. App. 2006) (relying on *Bryce* for the proposition that "a claim of constitutional immunity based on the church autonomy doctrine should be treated in the first instance as a motion [motion to dismiss for failure to state a claim instead of a motion to dismiss for lack of subject matter jurisdiction] because the court does in fact have jurisdiction to consider the constitutional claim."). The Supreme Court's decision in *Hosanna-Tabor*, which discusses *Watson* and its progeny approvingly, yet cites *Bryce*—in which the Tenth Circuit considered the application of the *church autonomy* doctrine in observing a circuit split on the question of whether the *ministerial exception* is an affirmative defense, does nothing to clarify the matter. *Hosanna-Tabor*, 565 U.S. at 185-87, 195 n.4; *Bryce*, 289 F.3d at 653-54 (considering whether the church autonomy doctrine was an affirmative defense to, or jurisdictionally barred, the plaintiff's Title VII, and related claims against the church that formerly employed her).

Considering the foregoing, it would be reasonable to conclude under the particular circumstances of this case—in which Plaintiff's claims do not arise out of an employment dispute, but are premised instead on Mr. Alexander's communications, channeled or otherwise, presented to the members of JMGC/CoW about the state of Plaintiff's soul—that Defendant's church autonomy doctrine argument actually challenges this Court's jurisdiction in the manner of *Watson* and its progeny. *See* Fed. R. Civ. P. 12(h)(3) (permitting the Court to dismiss an action at any time on the ground that it lacks subject matter jurisdiction over the matter). Nevertheless,

insofar as it is reasonable to assume (if not decide) that the Supreme Court's citation to *Bryce* in footnote 4 of the *Hosanna-Tabor* decision reflects the Supreme Court's implicit determination the Tenth Circuit has correctly determined that the church autonomy doctrine, like the ministerial exception, operates as an affirmative defense; and considering that the Defendants have raised and briefed this issue in a motion to dismiss under Rule 12(b)(6), the Court shall analyze the matter accordingly.

### III.  Standards Governing a Motion to Dismiss Based Upon an Affirmative Defense

"Under Rule 12(b) . . . , a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim." *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965). "If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule." *Id.* "But that is only when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018). In other words, only when the "plaintiff pleads itself out of court by admitting all of the ingredients of an impenetrable defense" may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6). *Fernandez*, 883 F.3d at 1299 (quoting *Xechem*, *Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 9010 (7th Cir. 2004).

### IV.  Plaintiff's Complaint Admits the Ingredients of a First Amendment-Based Affirmative Defense

### 1.  The Allegations in the Complaint Establish that Defendants' Beliefs are "Religious" for First Amendment purposes

"Although the Supreme Court has done little to identify positively what 'religion' is for First Amendment purposes, it has done a slightly better job of providing guidelines that courts should follow when attempting to determine whether a set of beliefs is 'religious.'" *United States v. Meyers*, 906 F. Supp. 1494, 1500 (D. Wyo. 1995), *aff'd,* 95 F.3d 1475 (10th Cir. 1996).

Religious belief does not necessarily entail a belief in God. *Kalka v. Hawk*, 215 F.3d 90, 98 (D.C. Cir. 2000) (citing *Torcaso v. Watkins*, 367 U.S. 488, 495, n.11, (1961)). "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 714 (1981). And courts may not consider whether the party's purportedly religious beliefs are true or false. *Meyers,* 906 F. Supp. At 1500 (citing *United States v. Ballard*, 322 U.S. 78, 92, (1944)).

In *Meyers*, where the issue was whether the "Church of Marijuana" was a *bona fide* religion that triggered the protections of the Religious Freedom Restoration Act ("RFRA"), the court compiled a list of factors that may inform the question whether a set of beliefs is "religious" for First Amendment purposes. *See Meyers*, 906 F. Supp. at 1495, 1501-03. Canvassing cases on religion[6] to discern indicia of religion, the *Meyers* court concluded that religious beliefs are characterized by: ultimate ideas, metaphysical beliefs, moral or ethical system, comprehensiveness of beliefs, and accoutrements of religion; *i.e.,* founder, prophet, teacher; important writings; gathering places; ceremonies and rituals; structure or organization; holidays; diet or fasting; appearance and clothing; and propagation. *Id.* at 1502-03. However, the court emphasized that no one of these factors was dispositive; instead, they should be viewed as

---

[6] The *Meyers* court gleaned many of the factors from the following cases: *Africa v. Commonwealth*, 662 F.2d 1025 (3d Cir. 1981); *Malnak v. Yogi*, 592 F.2d 197 (3d Cir. 1979); *United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983); *Founding Church of Scientology of Washington v. United States*, 409 F.2d 1146 (D.C. Cir. 1969); *Washington Ethical Soc'y v. District of Columbia*, 249 F.2d 127 (D.C. Cir. 1957); *United States v. Kauten*, 133 F.2d 703 (2d Cir. 1943); *Sherr v. Northport-East Northport Union Free School Dist.*, 672 F. Supp. 81 (E.D.N.Y. 1987); *Jacques v. Hilton*, 569 F. Supp. 730 (D.N.J. 1983); *Church of Chosen People v United States*, 548 F. Supp. 1247 (D. Minn. 1982); *Womens Services, P.C. v. Thone*, 483 F. Supp. 1022 (D. Neb. 1979), *aff'd,* 636 F.2d 206 (8th Cir. 1980); *Stevens v. Berger*, 428 F. Supp. 896 (E.D.N.Y. 1977); *Remmers v. Brewer*, 361 F. Supp. 537 (S.D. Iowa 1973); *United States v. Kuch*, 288 F. Supp. 439 (D.D.C. 1968); *Fellowship of Humanity v. County of Alameda*, 153 CalApp.2d 673, 315 P.2d 394 (1957); and W. Van Alstyne, *First Amendment* 1053 (2d ed. 1995). *U.S. v. Meyers*, 906 F. Supp. 1494, 1503, n. 9 (D. Wyo. 1995).

criteria that, if minimally satisfied, permit a conclusion that a set of beliefs qualifies as a "religion." *Id.* at 1503 (citing *Malnak v. Yogi*, 592 F.2d 197, 210 (3d Cir. 1979)).

The parties take contradicting positions on the question whether the allegations in the Complaint demonstrate that Defendants' beliefs are "religious" for First Amendment purposes. (Doc. 19 at 5-9; Doc. 32 at 2-3.) Defendants argue that the allegations in Plaintiff's Complaint demonstrate that Defendants' beliefs are "religious" as that term is defined in *Meyers* because: the members of JMGC are compelled by the "spiritual leader" (Mr. Alexander) to adopt the organization's reincarnation doctrines; the organization believes in, and is bound by, channeled communications from higher beings and master guides; the organization's beliefs include moral and ethical standards—as exemplified by the fact that it provides discussions and publications on the topic of spiritual development, and works toward eliminating sexual and financial predation in its membership; and the messages and beliefs are conveyed to the organization's membership in writing and at seminars and conferences. While Plaintiff argues that she has not alleged that JMGC is a "*religious* organization" nor has she alleged that the channeled communications constitute a "religious belief[,]" she does not refute the contention that the facts alleged in the Complaint exemplify several indicia of religion as set forth in *Meyers*. (Doc. 32 at 3.) Specifically, the allegations in the Complaint demonstrate that Defendants have metaphysical beliefs (*i.e.*, reincarnation and belief that past lives influence peoples' current lives and life decisions[7], channeled communications from master guides and higher beings that are binding on the membership,[8] a belief in souls and aspects of souls[9]), a "founder" or "teacher" (Mr. Alexander as spiritual leader, receiver of channeled communications and "Scribe"[10]), a moral

---

[7] Doc. 15, ¶¶ 11, 12, 14.
[8] *Id.*, ¶¶ 13, 30.
[9] *Id.*, ¶¶ 28, 31.
[10] *Id.*, ¶¶ 12, 13, 31.

system that includes instructions and beliefs that are binding on its members (promoting self-improvement, altruistic involvement and spiritual development, decrying predatory aspects of souls, distinguishing acceptable sexual and financial desires from inappropriate sexual and financial "predation", prohibiting members from engaging with "'destructive' influence"[11]), important writings (develops written materials to promote its reincarnation-based doctrines, worldview, and advocacy agenda to its members and to those interested in engaging with its programs, transcribes channeled communications presented at member conferences and published online to its membership[12]), gatherings ("Companions of Wisdom" conferences/seminars[13]), and an organizational structure (closed, invitation only, nonprofit organization with worldwide membership and "authoritarian" "hierarchical structure that does not permit dissent or questions regarding its doctrines or leadership" and disciplines dissenting members[14]). *See Meyers*, 906 F. Supp. at 1502 ("Religious beliefs often are 'metaphysical,' that is, they address a reality which transcends the physical and immediately apparent world."); *Jacques v. Hilton*, 569 F. Supp. 730, 733 ("Generally speaking, religious beliefs flow out of, and embody a sense of a relationship to a supreme being or supernatural force which gives rise to 'duties superior to those arising from any human relation.'"). In light of these allegations, it is of little consequence to the Court's analysis here that the Complaint is devoid of a conclusory allegation that the organization is a religion or that its beliefs are religious. *See generally*, *Mocek*, 813 F.3d 912, 921 (stating that Courts disregard conclusory statements provided in a complaint and rely, instead, on factual allegations); *Malnak v. Yogi*, 440 F.Supp 1284, 1319-20 (D. N.J. 1977) (rejecting the notion a litigant's subjective characterization of beliefs or practices

---

[11] *Id.*, ¶¶ 13, 15, 29, 31, 35, 36, 43, 44.
[12] *Id.*, ¶¶ 11, 15, 18, 30, 31.
[13] *Id.*, ¶¶ 11, 18, 20, 21, 24, 30, 31, 34.
[14] *Id.*, ¶¶ 11, 12, 19, 20, 21, 22, 23, 25, 26, 28, 37.

as religious or not religious informs the question whether the beliefs and practices are religious as a matter of law under the First Amendment).

Consistent with the admonition in *Meyers* that "no one . . . factor[] is dispositive, and that the factors should be seen as criteria that, if minimally satisfied, counsel the inclusion of beliefs within the term 'religion[,]'" the Court concludes that the allegations in the Complaint establish that Defendants' beliefs—which, objectively speaking, are not secular—are "religious" for First Amendment purposes. *Meyers*, 906 F. Supp. at 1503; *see id.* at 1503-04 (noting that under the factors, even "obscure beliefs" including, for example Animism, Wicca, Druidism, Santeria, and what is, in the present day, called "mythology" would all likely qualify as "religion"; whereas beliefs that are "[p]urely personal, political, ideological or secular[,]" such as nihilism, socialism, Marxism, and humanism, would not so qualify). By extension, JMGC/CoW, an organization that exists to promote its reincarnation-based spiritual doctrine and whose membership is required to adhere to its "religious" precepts, is entitled to First Amendment protections against tort claims on par with churches and other religious organizations. That is, in the limited context of this case, and based upon the factual allegations in the Complaint, JMGC/CoW retains exclusive control, protected by the First Amendment, over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson*, 80 U.S. at 733; *Kedroff*, 344 U.S. at 116 (recognizing that the freedom accorded to religious organizations from secular control or manipulation is grounded in the First Amendment).

Although the Court concludes that Defendants' beliefs and practices are "religious" under the First Amendment, the Court's inquiry does not end there. While it is clear that "religious controversies" and "matters of faith, doctrine, church governance and polity" are not the proper

subject of civil court inquiry," *Milivojevich*, 426 U.S. at 713, *Bryce*, 289 F.3d at 655, not every civil court dispute involving a religious organization requires the court to resolve ecclesiastical questions. *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449-50 (1969). Of course, "[w]hen the imposition of liability would result in the abridgement of the right to free exercise of religious beliefs, recovery in tort is barred." *Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875, 880 (9th Cir. 1987). However, a civil court does not run afoul of the First Amendment by applying neutral principles of law to resolve such disputes. *Presbyterian Church in U.S.*, 393 U.S. at 449 (recognizing that "not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment"; and "[c]ivil courts to not inhibit the free exercise of religion merely by opening their doors to disputes involving church property" and applying neutral principles of law, developed for use in all property disputes).

In other words, if a dispute involving a religious organization can be resolved by application of neutral principles of law, and does not require the court to become entangled in questions of religious doctrine, polity, and practice, the First Amendment—and by extension, the church autonomy doctrine—does not bar the litigation. *Jones v. Wolf*, 443 U.S. 595, 602-03 (1979) (discussing the "neutral-principles approach" as "completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity" in the context of a church property dispute); *Milivojevich*, 426 U.S. at 710 (recognizing that if civil courts undertake to resolve controversies involving religious organizations, it must be done "without resolving underlying controversies" involving religious doctrine and practice). Correspondingly, if the claims are "rooted in religious belief," the religion clauses of the First Amendment prohibit civil court interference. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). Thus, the crux of the

issue raised by Defendant's motion is whether it is evident from the face of Plaintiff's complaint that the Court may adjudicate Plaintiff's claims by applying neutral principles of law without becoming entangled in matters of a religious nature.

### 2.  Analysis of Plaintiff's Claims

Broadly speaking, Plaintiff seeks damages arising from two forms of allegedly tortious conduct: Defendants' statements about the nature of Plaintiff's soul, which were disseminated to the membership of JMGC/CoW; and Defendants' efforts to ostracize her from the organization and its members, including her then-fiancée, now husband, Mr. Kyzer. Plaintiff claims that this is purely a secular dispute that can be resolved through the application of neutral principles of law without "doctrinal or organizational entanglement." (Doc. 32 at 3.) The Court does not agree.

### a.  General Principles Relevant to Plaintiff's Particular Theories of Recovery Support Dismissal of Plaintiff's Claims on First Amendment Grounds

As an initial observation, there is no bright line legal proposition that governs the question whether tort claims brought by current or former members of religious organizations that defame or ostracize them are barred by the First Amendment. And a review of the case law reveals that decisions are driven by the nuances underlying the particular claims. For example, in the defamation context, the Supreme Court of Iowa rejected a First Amendment defense to a claim of defamation arising out of a letter disseminated to members of the general public by a church minister describing the plaintiff as the "spirit of Satan." *Kliebenstein v. Iowa Conference of United Methodist Church*, 663 N.W.2d 404, 405-07 (Iowa 2003). The court reasoned that although the phrase "spirit of Satan," clearly conveys sectarian meaning, it also carries a secular meaning and could, therefore effect the secular public's impression of the plaintiff's character. *Id.* Conversely, the Iowa Court of Appeals held that a defamation claim based on church

officials having stated that the plaintiff "lied," that he was "in league with Satan" and that he had been "sleeping around" was barred by the First Amendment since these comments arose out of an underlying dispute between the plaintiff and his church and, unlike the *Kliebenstein* case, the comments were presented only to church members. *Howard v. Covenant Apostolic Church, Inc.*, 705 N.E.2d 385, 388-89 (Iowa Ct. App. 1997). The coexistence of *Kliebenstein* and *Howard* as governing law within the same judicial jurisdiction illustrate the importance of context and of subtle distinctions in the context of the First Amendment defense to tort claims against "religious" institutions. With that in mind, the Court, having reviewed a number of cases from courts in several jurisdictions, has derived some general principles that usefully inform its analysis of Defendant's First Amendment defense in the context of this case.

The first principle is that courts generally do not permit tort claims arising from internal processes by which religious organizations discipline their members or determine whether a person's character renders her suitable for continued membership or participation in the organization. This is so even where the conduct underlying the tort claim would be actionable in another context.

For example, the Minnesota Court of Appeals held that a couples' claim for defamation against their former pastor who had read a letter to the entire congregation of his church setting out the reasons for terminating the couple's membership was barred by the First Amendment even as to statements that were ostensibly unrelated to church doctrine. *Schoenhals v. Mains*, 504 N.W.2d 233, 234-36 (Minn. Ct. App. 1993). The letter related that the couple's church membership was being terminated for:

> 1. A lack of financial stewardship with consistency and faithful tithing and offering over a given period of time.
> 2. A desire on your part to consistently create division, animosity and strife in the fellowship.

> 3. Direct fabrication of lies with the intent to hurt the reputation and the establishment of Faith Tabernacle of Truth Church and congregation.
> 4. Backbiting, railing accusations, division, lying, are some of the most serious sins found in the Bible. Where, by all appearances and related conversations, you have fallen into all of the categories.

*Id.* at 234. As to some of these allegedly defamatory statements—*i.e.* those related to the couple's faithfulness to the church, the court reasoned that a jury could not decide their truth or falsity without impermissibly inquiring into the church's doctrines. *Id.* at 236. Further, the court reasoned, although the issue whether the couple

> had engaged in 'direct fabrication of lies with intent to hurt the reputation and the establishment' of the church appears unrelated to the church doctrine on its face, the statement nevertheless relates to the [c]hurch's *reasons and motives for terminating the [couples'] membership*. Examination of those reasons and motives would also require an impermissible inquiry into [c]hurch disciplinary matters. The couples' claim clearly involves an internal conflict within the church, which is precluded by the First Amendment.

*Id.* at 236 (emphasis added).

Likewise in *Downs v. Roman Catholic Archbishop of Baltimore*, 683 A.2d 808 (Md. Ct. Spec. App. 1996), an action for defamation against a church and several members of the church hierarchy brought by a plaintiff who had formerly aspired to Priesthood was barred by the First Amendment. The plaintiff claimed that certain members of the church hierarchy had made defamatory statements concerning his honesty, reliability, integrity, morality, and had also made assertions of "sexually motivated conduct toward certain staff members" of a Parish; with the intention, and with the effect of, preventing him from becoming a priest. *Id.* at 809-10, 813. Although the plaintiff argued that the First Amendment did not bar his claims because the case was "simply one of defamation" and he was not seeking judicial review of any decision made by the church, the court reasoned that the matter was essentially an ecclesiastical controversy barred by the First Amendment. *Id.* at 810-11. Noting that the defamatory statements were allegedly

made "with the intent to harm the [p]laintiff's chances for ordination to the priesthood[,]" the court reasoned that "the very heart of the action is a decision by . . . clerical supervisors to prevent [the plaintiff] from becoming a priest." *Id.* at 813. Thus, the court reasoned, "[e]ven where the dispute actually presented to the court is one that, if presented by any other set of litigants, would clearly be justiciable" insofar as the plaintiff's defamation claim was intertwined with the church's determination that the plaintiff was not a suitable candidate for priesthood, the matter is not within the court's authority. *Id.*

As another example, in *C.L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389 (Tex. 2007), the Supreme Court of Texas concluded that the First Amendment barred tort claims brought by a former member of a church against the church's pastor (who was also a professional counselor) and other church officials after they disseminated a letter to the church congregation revealed confidential information gleaned by the pastor during counseling sessions. *Id.* at 393. Among other things, the letter informed the congregation that the plaintiff intended to divorce her husband and that she had engaged in a "'biblically inappropriate' relationship with another man,'" and it encouraged the congregation to "break fellowship" with her. *Id.* The fact that the plaintiff had engaged in an extramarital sexual affair was something that the plaintiff had disclosed to the pastor in the context of marital counseling sessions. *Id.* In a lawsuit arising out of these events, the plaintiff claimed defamation, professional negligence, breach of fiduciary duty, and intentional infliction of emotional distress. *Id.* at 394, 399.

In an effort to overcome the defendants' First Amendment defense, the plaintiff (Penley) argued that her professional negligence claim could be resolved by neutral principles of tort law because her lawsuit centered on the pastor's disclosure of confidential information that he had learned during marital counseling sessions and, as such, the controversy did "not involve matters

of religious doctrine, practice or church governance." *Id.* at 400. The court rejected this argument. *Id.* The court reasoned that although Penley's theory of tort liability was based, in part, on the pastor's breach of a secular duty of non-disclosure of confidential information, "this disclosure cannot be isolated from the church-disciplinary process in which it occurred, nor [could the pastor's] free-exercise challenge be answered without examining what effect the imposition of damages would have on the inherently religious function of church discipline." *Id.* In other words, although "it might be theoretically true that a court could decide whether [the pastor/counselor] breached a secular duty of confidentiality without having to resolve a theological question," insofar as the claim was inherently tied to the church's process of expelling the plaintiff's membership, the court could not do so without "unconstitutionally imped[ing] the church's authority to manage its own affairs." *Id.* at 397-98.

A final example, mentioned earlier, is the Iowa Court of Appeals' decision in *Howard*. There, the court held that a defamation claim premised on church members or officials having stated that the plaintiff "had lied, that he was in league with Satan, . . . and that he had been sleeping around" was barred by the First Amendment because the statements arose out of an underlying dispute between him and the church as part of an effort to remove his church membership and were made during a church meeting. *Howard*, 705 N.E.2d at 388-89.

A second principle relevant to the facts and circumstances here, is that the First Amendment bars tort claims that arise from circumstances in which a plaintiff has been ostracized from a religious community—a practice known, formally in some religions, as "shunning." *See Paul*, 819 F.2d at 876-77 (recognizing that "shunning" is a form of ostracism that purportedly has its roots in early Christianity, and which is practiced by various religious groups, including the Amish, Mennonites, and Jehovah's Witnesses). In these cases, too, courts

have concluded that even where the religious organization engages in conduct that, in other circumstances could be actionable under tort law, the First Amendment does not permit judicial interference in what are, essentially, ecclesiastical disputes concerning membership in religious organizations.

For example, the Ninth Circuit Court of Appeals concluded, in *Paul*, that to allow a plaintiff to pursue tort claims against a religious organization based on shunning practices would effectively abridge the free exercise of religion guaranteed by the First Amendment.[15]  819 F.3d at 880.  The plaintiff in *Paul*, a former member of the Jehovah's Witnesses, having been told by a close childhood friend: "I can't speak to you.  You are disfellowshipped."; having received similar treatment from other friends; and having been ostracized at a tupperware party at the home of a Jehovah's witness because "the Elders" had instructed members of the faith not to speak to her, filed tort claims against the corporate arms of the Governing Body of Jehovah's Witnesses.  *Id.* at 876-77.  In her lawsuit, the plaintiff claimed that defendants had engaged in intentional conduct causing emotional distress, intentional conduct causing alienation of affections, and intentional conduct causing harm to reputation.  *Id.* at 879.  In affirming the dismissal of plaintiff's lawsuit, the *Paul* court concluded that the imposition of tort damages on the Jehovah's Witnesses for engaging in the religious practice of shunning would essentially criminalize and force the church to forego the practice, thereby imposing a direct burden on religion.  *Id.* at 880-81 (citing *Langford v. United States*, 101 U.S. 341, 345 (1879) for the proposition that "the very essence of a tort is that it is an unlawful act" (alteration omitted)).

---

[15] Notably, the Ninth Circuit did not consider the "ecclesiastical abstention doctrine" relevant to the issue whether the First Amendment barred tort claims arising out of the religious practice of shunning.  *Paul*, 819 F.2d 875, 878 n.1.  In that regard, the court noted that the plaintiff "seeks relief for the harms she has suffered as a result of conduct engaged in by the Jehovah's Witnesses that is presumably consistent with the governing law of the Church."  *Id.*  As such, the issue was not governed by the ecclesiastical abstention doctrine which prohibits courts from adjudicating a church's decision relating to government of the religious polity.  *Id.*  Accordingly, the court decided the matter by application of the free exercise clause of the First Amendment.

In another case involving "disfellowship" or "shunning," the Supreme Court of Alaska concluded that the First Amendment barred a plaintiff's claims of negligent infliction of emotional distress, intentional infliction of emotional distress, and defamation, among others. *Sands v. Living Word Fellowship*, 34 P.3d 955, 956, 959 (Alaska 2001). In *Sands*, the plaintiff shot himself in an attempted suicide after a church (Living Word) and two of its members (the parents of the plaintiff's girlfriend), instructed the congregants of Living Word as well as the congregants of eight other churches to "shun" the members of Wasilla Ministries—the church to which the plaintiff belonged. *Id.* at 957. Among other things, the defendants said that Wasilla Ministries was a cult, and that the plaintiff was a "cult recruiter." *Id.* Underlying this feud was a disagreement on parental authority—apparently related to the relationship between the plaintiff and his girlfriend, and biblical interpretation. *Id.* Two local newspapers published the defendants' allegations against Wasilla Ministries. *Id.* These events caused the plaintiff great emotional distress and led him to attempt suicide which attempt, though unsuccessful, rendered him paralyzed from the chest down. *Id.*

The *Sands* court reasoned that the defendants' "shunning" directive to its congregation and that of eight other churches was religiously based, and was motivated by religion. *Id.* at 959. Likewise, the court reasoned that defendant's statements that the plaintiff was a cult recruiter, and the church of which he was a member was a cult were statements reflecting religious beliefs and opinions. *Id.* at 960. Because the plaintiff's claims arose out of an essentially religious dispute, the *Sands* court accordingly concluded that the claims were barred by the First Amendment. *Id.* at 959-60.

A third principle relevant to the claims at issue here is a recognition by some courts of a distinct legal effect between circumstances in which defamatory comments are published

exclusively to the members of a religious organization and circumstances in which the comments are published, as well, to the general community. *See e.g.*, *Schoenhals*, 504 N.W.2d at 236 (reasoning that the fact that the defamatory letter was disseminated only to other members of the Church strengthens the conclusion that the defamation claim arose from and was limited to an internal conflict within the Church and is thus barred by the First Amendment"); *compare Kliebenstein*, 663 N.W.2d at 406-07 (holding that the fact that a minister's letter describing the plaintiff as the "spirit of Satan" was disseminated to members of the community who were not affiliated with the church "weakens [the] ecclesiastical shield" because the protections afforded in this context "may be lost upon proof of excess publication or publication 'beyond the group interest'")), *with Howard*, 705 N.E.2d at 388-89 (holding that a defamation claim premised on church members or officials having stated that the plaintiff "had lied, that he was in league with Satan, . . . and that he had been sleeping around" was barred by the First Amendment because the statements arose out of an underlying dispute between him and the church as part of an effort to remove his church membership and were made during a church meeting); *but see Sands*, 34 P.3d at 957 (barring the plaintiff's defamation claim on First Amendment grounds without discussing the fact that the alleged defamatory statements were reported in two local newspapers).

Applying the foregoing principles to the circumstances here, the Court concludes that the First Amendment bars Plaintiff's claims. As alleged in the Complaint, the conduct giving rise to Plaintiff's claims originally stemmed from an internal dispute between Plaintiff and the leadership of JMGC prompted by Plaintiff's "inquiring nature" and her "resistance" to the directives of the leadership. It is evident from the face of the Complaint, however, that JMGC is an authoritarian organization that does not permit dissent or questions regarding its doctrines or leadership. Thus, when she dissented from and questioned the leadership's directives, Plaintiff

flouted the standards of conformity required of JMGC's membership—standards that Plaintiff impliedly assented to be governed by when she joined the organization's membership nearly a decade ago.[16] *See Watson*, 80 U.S. at 729, 733 (stating that a person who voluntarily joins a religious organization impliedly consents to be governed by the organization's customs and rules pertaining to the conformity of the members of the organization to the standards required thereby).

It is also evident from the face of the Complaint that JMGC's prevailing practice in regard to dissenting members is to publish maligning statements about them which are intended to cause emotional and psychological trauma, and to isolate the dissenting members. Thus, the conduct underlying Plaintiff's claims precisely accords with the manner in which JMGC administers its membership. To permit Plaintiff to pursue tort claims against JMGC for having published defamatory statements to its membership regarding Plaintiff (specifically about "aspects" of Plaintiff's "soul") and for its efforts to ostracize her from the organization and its members would constitute an impermissible civil court intrusion upon JMGC's Constitutionally protected right to manage its own affairs. *Schoenhals*, 504 N.W.2d at 236 (holding that the First Amendment barred a couples' claim of defamation where the defamatory comments were made in the context of terminating the couple's church membership; *Downs*, 683 A.2d at 813 (holding that defamatory comments were not actionable in tort law because the comments were intertwined with the church's determination that the plaintiff was not a suitable candidate for priesthood); *C.L. Westbrook, Jr.*, 231 S.W.3d at 397-98 (holding that an otherwise actionable professional negligence claim against a pastor was barred by the First Amendment because the circumstances giving rise to the claim was inherently tied to the process of expelling the plaintiff's membership, and it could not be adjudicated without "unconstitutionally imped[ing]

---

[16] Doc. 15, ¶¶20-21.

the church's authority to manage its own affairs"); *Howard*, 705 N.E.2d at 388-89 (holding that the First Amendment barred a lawsuit for defamatory comments that were made in the context of an underlying dispute between the plaintiff and his church); *Paul*, 819 F.2d at 880-81 (holding that the imposition of tort damages on a religious organization for engaging in "shunning" would unconstitutionally impose a direct burden on religion); *Sands*, 34 P.3d at 958-59 (holding that the First Amendment barred claims based on the emotional distress caused by ostracism and defamatory statements in the context of a religious dispute).

Further, the allegedly defamatory statements arose in the context of Defendants relating to their members the reasons that Plaintiff's JMGC/CoW membership was terminated. For example, that Plaintiff's soul has a split who is a porn star; that her soul was part of the Manson cult and other sex cults; and that "one aspect of [her] soul . . . was predatory in [the] group" are among the allegedly defamatory statements that Plaintiff seeks to vindicate here. However, it is evident from the face of the Complaint that these statements related to the reasons that Plaintiff's membership in JMGC/CoW was no longer viable. It is neither appropriate, nor under the First Amendment is it permissible, for a civil court to adjudicate a defamation claim that arose in this context. *Schoenhals*, 504 N.W.2d at 236 (holding that civil courts are barred from adjudicating matters that relate to the termination of the plaintiff's membership from a religious organization); *Wisconsin*, 406 U.S. at 215 (holding that civil courts may not adjudicate matters that are "rooted in religious belief").

Finally, to the extent that the allegations in the Complaint suggest that the allegedly defamatory statements were published exclusively to the JMGC's membership,[17] this fact

---

[17] In this regard, the Court notes that Plaintiff alleges that JMGC published the at-issue statements to "JMGC's worldwide membership" on its website; and that after her membership was terminated, she was prohibited from reading any of JMGC's and "COW's channeled communications." (Doc. 15 at ¶¶ 30, 37)

strengthens the Corut's conclusion that Plaintiff's claims, having occurred in the context of an ecclesiastical dispute with JMGC/CoW, are barred by the First Amendment. *Schoenhals*, 504 N.W.2d at 236 (reasoning that the fact that the defamatory letter was disseminated only to other members of the Church strengthens the conclusion that the defamation claim arose from and was limited to an internal conflict within the Church and is thus barred by the First Amendment").

As noted earlier, Plaintiff seeks to recover under the tort theories of defamation,[18] false light invasion of privacy, intentional infliction of emotional distress, and civil conspiracy. Because the conduct at issue occurred in New Mexico (Doc. 15 ¶ 6), Plaintiff's claims are governed by the substantive law of this state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that a federal court sitting in diversity must apply the substantive law of the forum); *McPhail v. Deere & Co.,* 529 F.3d 947, 957 (10th Cir. 2008) (applying substantive law of forum state in diversity action).

New Mexico Courts have had limited occasion to construe and apply the First Amendment in the context of tort claims against a religious institution. *See Galetti v. Reeve*, 331 P.3d 997, 999 (N.M. Ct. App. 2014) (concluding that a teacher whose employment at a religious school had been terminated could pursue a breach of contract claim which could be resolved without any religious intrusion because the only issue raised thereby was whether the religious organization complied with its contractual obligations; but remanding the plaintiff's other tort claims— including civil conspiracy and defamation—for the district court to consider whether these claims involved religious matters); *see Celnik*, 131 P.3d at 103-04, 107 (affirming the dismissal of a lawsuit brought by a Rabbi against the religious organization that formerly employed him based on the "ministerial exception"). However, in accord with the general First Amendment

---

[18] New Mexico does not recognize the tort of "defamation per se." *Smith v. Durden*, 276 P.3d 943, 948-49, 951 (N.M. 2012).

and church autonomy principles discussed earlier, the Court of Appeals of New Mexico has recognized that "[t]he First Amendment does not immunize every legal claim against a religious institution or its members, but only those claims that are rooted in religious belief." *Galetti*, 331 P.3d at 999. Thus, whether the First Amendment bars a particular tort claim depends on whether the alleged misconduct is rooted in religious belief[,]" which question must be answered by considering the elements of the plaintiff's claim to determine whether adjudication of the claim "would require the court to choose between competing religious visions, or cause interference with the church's administrative prerogatives." *Id.* at 1001.

In New Mexico, defamation is defined as "a wrongful and unprivileged injury to a person's reputation." Civ. U.J.I. 13-1001 NMRA (brackets omitted.) The elements of defamation include: a defamatory communication, published by the defendant, to a third person, of an asserted fact, which is false, of and concerning the plaintiff, and proximately causing actual injury to the plaintiff's reputation. *Cory v. Allstate Ins*., 583 F.3d 1240, 1243 (10th Cir. 2009) (quoting *Newberry v. Allied Stores, Inc.,* 108 N.M. 424, 773 P.2d 1231, 1236 (1989)); *see also* N.M. Civ. UJI 13–1002 (listing all nine elements of defamation).[19] "Defamatory communications are those which tend to expose a person to contempt, to harm the person's reputation, or to discourage others from associating or dealing with [him or her]." *Cory*, 583 F.3d at 1243 (quoting N.M. Civ. UJI 13–1007).

---

[19]The elements of a prima-facie case of defamation are (i) a published communication (i.e. something intentionally or negligently communicated to a person other than the plaintiff; (ii) the communication includes an asserted statement of fact; (iii) the communication was concerning the plaintiff; (iv) the statement of fact is false; (v) the communication is defamatory (*i.e.*, it tended to expose the plaintiff to contempt, to harm her reputation, or to discourage others from associating or dealing with her); (vi) the persons receiving the communication understood it to be defamatory; (vii) the defendant knew the communication was false or negligently failed to recognize that it was false, or acted with malice; (viii) the communication caused actual injury to the plaintiff's reputation; and (ix) the defendant abused its privilege to publish the communication. *See* Civ. U.J.I. 13-1002(B), 13-1003, 13-1007, N.M.R.A.

The tort of false light invasion of privacy is "a close cousin of defamation." *Andrews v. Stallings*, 892 P.2d 611, 625 (N.M. Ct. App. 1995). To prevail in a false light invasion of privacy claim, the plaintiff must prove: that she "was portrayed in a false light" meaning that "the matter published concerning the plaintiff is not true"; that the false portrayal would be highly offensive to a reasonable person such that the plaintiff would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity"; and "that the publisher had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Young v. Wilham*, 406 P.3d 988, 1007–08 (N.M. Ct. App. 2017) (alterations omitted).

To prevail in a claim of intentional infliction of emotional distress, a plaintiff must prove that (1) the defendants engaged in conduct that "was extreme and outrageous"; (2) the conduct was intentional or done "in reckless disregard of the plaintiff"; (3) the plaintiff suffered "extreme and severe" mental distress; and (4) "there is a causal connection between the defendant's conduct and the [plaintiff's] mental distress." *Baldonado v. El Paso Nat. Gas Co.*, 176 P.3d 286, 298 (N.M. Ct. App. 2008).

Finally, in order to prevail in a claim for civil conspiracy, a plaintiff is required to show that: (1) a conspiracy existed between two or more individuals; (2) pursuant to the conspiracy, the defendants carried out specific wrongful acts; and (3) the plaintiff was damaged as a result of these acts. *Cain v. Champion Window Co. of Albuquerque, LLC*, 164 P.3d 90, 98 (N.M. Ct. App. 2007). However, the tort of civil conspiracy does not provide an independent basis for liability; instead, it requires the plaintiff to establish "an independent unlawful act—*i.e.* "something that would give rise to a civil action on its own." *Id.* In this case, Plaintiff's civil conspiracy claim is tied to her claim of defamation. (Doc. 15 ¶¶ 76-79.)

The statements and conduct giving rise to Plaintiff's lawsuit cannot be adjudicated without impermissible intrusion upon Defendants' right, guaranteed by the First Amendment, to freely exercise their religion. Each of Plaintiff's claims, if adjudicated in a civil trial, would require the jury (or judge in the role of fact-finder) to resolve questions that are rooted in religion. For example, in order to succeed in her defamation claim or in her false light invasion of privacy claim, Plaintiff would have to prove, among other things that, as a matter of fact, Plaintiff does not: have "a split who is a porn star"; Plaintiff's soul has not been part of "several sex cults"; and that no aspect of Plaintiff's soul was sexually or financially "predatory" within JMGC/CoW. *See Young*, 406 P.3d at 1007–08 (stating that in order to prevail in a false light invasion of privacy claim, the plaintiff is required to prove that the at-issue statement was "not true") Civ. U.J.I. 13-1002(B) NMRA (stating the elements of defamation, including that an asserted statement of fact regarding the plaintiff was "false"). She would have to prove, further, that when Defendants made these statements they knew or should have known that they were false. *Id.* (stating that a claim of defamation requires proof that the publisher knew or should have known that the communication was false; *Young*, 406 P.3d at 1007–08 (stating that false light invasion of privacy requires proof of the publisher's knowledge or reckless disregard of the falsity of the matter). To require a jury (or judge in the role of fact-finder) to determine the truth or falsity of these statements and the extent to which Defendants believed them would entangle this secular Court in a dispute centered upon Plaintiff's and Defendants' competing religious visions about the nature of Plaintiff's soul and whether the nature of her soul rendered her continued membership within JMGC/CoW untenable. Under the First Amendment, such inquiries are not within the purview of a civil court. *See Galetti*, 331 P.3d at 1001 (recognizing that courts are prohibited from adjudicating matters that implicate competing religious visions or interfere with

a religious organization's administrative prerogative); *see also Watson*, 80 U.S. at 728–29 (indicating that matters of church discipline and the conformity of members of the church to the standard of morals required of them are "strictly and purely ecclesiastical"). Accordingly, Plaintiff's claims of defamation and false light invasion of privacy are barred by the First Amendment and shall be dismissed accordingly. Plaintiff's civil conspiracy claim—which is tied to her defamation claim (Doc. 15 ¶¶ 76-79), must also be dismissed. *Cain*, 164 P.3d at 98 (holding that the plaintiff's civil conspiracy claim failed because the underlying claim to which it was tied was not actionable).

Plaintiff's claim of intentional infliction of emotional distress seeks to vindicate the harm that Plaintiff suffered as a consequence of Defendants' statements and their efforts to ostracize her from JMGC/Cow and its members, including Mr. Kyzer. (Doc. 15 at ¶¶ 70-75.) However, as noted earlier, civil courts are generally prohibited from intervening in internal religious disputes involving ostracizing or shunning or making allegedly defamatory statements in the process of expelling someone from a religious organization. *See e.g. Paul*, 819 F.2d at 880 (holding that to allow a plaintiff to pursue tort claims against a religious organization based on shunning would effectively abridge the free exercise of religion guaranteed by the First Amendment); *see Sands*, 34 P.3d at (holding that the First Amendment barred claims based on the emotional distress caused by ostracism and defamatory statements in the context of a religious dispute). Thus, even assuming that a fact finder could determine whether Defendants' conduct was "extreme and outrageous" and that it was "intentional" or "done in reckless disregard of" the Plaintiff *without* becoming entangled in questions of an ecclesiastical or religious nature,[20] to permit Plaintiff to pursue her claim for damages based on Defendants'

---

[20] The Court notes that, as it pertains to Mr. Alexander's "channeled" "Communication 17" regarding the state of Plaintiff's soul, this is a tenuous assumption.

having ostracized and defamed her would, in the context of this case, amount to impermissible government interference with Defendants' right to practice their faith. *Paul*, 819 F.2d at 880-81 (reasoning that to allow the imposition of tort damages on a religious organization for shunning a former member would essentially criminalize and force the church to forego the practice, thereby imposing a direct burden on religion); *see Galetti*, 331 P.3d at 1001 (stating that if the remedy sought by the plaintiff would substantively or procedurally interfere with a religious organization's operations the First Amendment operates as a "shield" against litigation). Accordingly, Plaintiff's claim of intentional infliction of emotional distress is barred by the First Amendment and shall be dismissed.

## CONCLUSION

For the reasons stated herein, Defendants' Rule 12(b)(6) Motion to Dismiss With Supporting Memorandum, filed November 16, 2017, (Doc. 19) is **GRANTED**. Plaintiff's First Amended Complaint for Defamation/Defamation Per Se/False Light Invasion of Privacy, Intentional Infliction of Emotional Distress, Civil Conspiracy, Injunctive Relief (Doc. 15) is **DISMISSED** with **PREJUDICE**.

**IT IS SO ORDERED.**

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent